Sybron Canada Holdings, Inc., Implant Direct Sybron International, LLC, Implant Direct Sybron Manufacturing, LLC, Implant Direct Sybron Administration, LLC, Plaintiffs,

against
Gerald A. Niznick, Implant Direct Int'l, Inc., Implant Direct Mfg., LLC, Mikana Manufacturing Company, Inc., Defendants.

Implant Direct Int'l, Inc., Implant Direct Mfg., LLC, Mikana Manufacturing Company, Inc.Defendants and Counterclaim Plaintiffs,
against
SYBRON CANADA HOLDINGS, INC., Implant Direct Sybron International, LLC, Implant Direct Sybron Manufacturing, LLC, Implant Direct Sybron Administration, LLC,Plaintiffs and Counterclaim Defendants.

650908/14

laintiffs: Edward Bennett, R. Kennon Poteat, III, Lauren H. Uhlig and A. Joshua Podoll, Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C. (202) 434-5083 ebennett&commat;wc.com and Joe W. Tomaselli, Jr. and Andrew Goldman, Goldman Ismail Tomaselli Brennan & Baum LLP, 3131 Turtle Creek Boulevard, Dallas, Texas 75219 (214) 880-9903 jtomaselli&commat;goldmanismail.com
Defendants: Gary I. Lerner and Martin H. Samson, Davidoff Hutcher & Citron LLP, 605 Third Avenue, New York, NY 10158 (646) 428-3217 gil&commat;dhclegal.com and Donald S. Gottesman, Kulik Gottesman & Siegel LLP, 15303 Ventua Boulevard, Suite 1400, Sherman Oaks, CA 91403 (310) 557-9200 dgottesman&commat;kgswlaw.com


Barry Ostrager, J.

After three years of litigation, scores of pre-trial depositions, ten days of trial, more than twenty-five trial witnesses whose testimony consumed more than 50 hours of trial time, 300+ trial exhibits, extensive pre-trial motion practice, more than 100 pages of pre-trial and post-trial memoranda, and numerous letters submitted to Chambers throughout the discovery, pre-trial, and trial process, this deca-million-dollar dispute boils down to nothing more than sorting out the rights and obligations of a soured joint venture arrangement which is governed by a detailed and heavily negotiated set of transactional documents. There are many issues in this case, which this decision will resolve on the facts and the law in appropriate sections, but the main issues are whether the 75% majority owner of the joint venture can exercise its Employment Call Option [*2](ECO) and/or Cause Call Option (CCO) to buy out the remaining 25% interest of a contentious minority shareholder, and whether the acquiring corporation improperly withheld distributions of excess cash to that minority shareholder and whether it ignored the minority shareholder's veto right in connection with certain "transactions."
FINDINGS OF FACT
At its core, this is a simple case. Danaher Corporation ("Danaher") is a multi-billion-dollar public corporation which sought to increase its market share in the dental consumable market when it purchased, through its subsidiary Sybron Dental Specialties ("Sybron")[FN1]
, a 75% majority interest in Dr. Gerald A. Niznick's ("Dr. Niznick") successful dental implant business, Implant Direct International LLC and its two related limited liability companies (collectively "Implant Direct"). Implant Direct was 100% owned and controlled by Dr. Niznick. 
Danaher and Dr. Niznick, both represented by sophisticated counsel, entered into a series of agreements in late 2010 following more than six months of protracted and detail-oriented negotiations. The rights and obligations of the joint venturers are contained in three parallel, multi-section, 52-page Operating Agreements.[FN2]
Pursuant to the Transaction Agreement dated November 17, 2010 [FN3]
: Danaher agreed to pay Dr. Niznick $225 million for a 75% majority and controlling interest in Implant Direct (which operated as three Joint Venture Companies or "JVCs" post-closing [FN4]
), Dr. Niznick remained President of the JVCs pursuant to a separately negotiated employment agreement, and Dr. Niznick retained an illiquid 25% minority interest in the JVCs and was named to a seat on a four-person Board of Managers ("Board"). Dr. Niznick was empowered as President of the JVCs to manage the day-to-day operations of the JVCs, reporting initially to the Chairman of Sybron and, at a subsequent point in time, to the four-person Board, three of whose members were appointed by Danaher.
It is undisputed that Dr. Niznick's entrepreneurial skills and ingenuity as the inventor of dozens of dental implant patents had been integral to Implant Direct's growth from its founding in 2006 into a 400-employee company with annual gross sales of $50 million and net profits of roughly $20 million in 2010. The agreements among the joint venturers were structured to provide disincentives for Dr. Niznick to either terminate his employment before the expiration of his employment contract or to engage in conduct that would constitute cause for terminating his employment. This was accomplished by, among other things, granting Danaher discretionary options to acquire "all but not less than all" of Dr. Niznick's 25% interest in the JVCs (the so-called Cause Call Option and the Employment Call Option). Dr. Niznick's incentives to perform under the transactional agreements was the future potential income from and appreciation in the value of his 25% interest in the JVCs. The transactional agreements also contained a mandatory option that obligated Danaher to purchase 5% of Dr. Niznick's 25% interest on January 31, 2014 [*3]at a price determined in accordance with a negotiated formula contained in the Operating Agreements. A plain reading of the Operating Agreements (and common sense) make it clear that Danaher's mandatory buy-out obligation would be mooted if, prior to January 31, 2014, Dr. Niznick engaged in conduct that entitled Danaher to exercise either the ECO or CCO, thereby enabling Danaher to purchase Dr. Niznick's entire 25% interest in the JVCs. 
Danaher entered into its relationship with Dr. Niznick aware of Dr. Niznick's provocative history of taking advantage of "loopholes" in prior transactions to his significant financial benefit. Messrs. Raskas and Tomassi, both of whom were involved in the due diligence in connection with Implant Direct's acquisition in 2010, testified that the buyout provisions in Section 9.04 of the Operating Agreements were drafted to protect Danaher from potential disputes with Dr. Niznick similar to the disputes Dr. Niznick had with Zimmer Dental, Inc. ("Zimmer"), the corporate entity that purchased Dr. Niznick's previous dental implant company for $100 million in 2004 (PX 1). That litigation involved allegations that Dr. Niznick's breached contractual non-compete, non-solicitation, and non-disparagement provisions, and was ultimately resolved in a manner that enabled Dr. Niznick to pursue the development of Implant Direct in direct competition with Zimmer, hiring many of the employees from the company he had sold to Zimmer (Tr. 1202:24 — 1204:11). Thus, from Danaher's point of view, much of the pre-closing negotiations focused on assuring that Danaher would receive during the term of Dr. Niznick's employment the benefits of Dr. Niznick's success as an innovator and marketer of dental implant products as well as his prominence in the dental implant industry. At the time of the Implant Direct negotiations, Dr. Niznick was already a centi-millionaire and Danaher paid a premium to acquire a controlling interest in Implant Direct based upon the parties' valuation of Implant Direct.
Notwithstanding the duration of the negotiations, Danaher failed either to attach significance to or focus upon the fact that a family trust controlled by Dr. Niznick owned the building which housed the primary Implant Direct manufacturing facility in Calabasas, California, subject to a lease to Implant Direct that expired on October 31, 2014. Another trust controlled by Dr. Niznick also owned a facility in Valencia, California at which Implant Direct conducted its sales operations.
Shortly after the closing, and increasingly through late 2013, Dr. Niznick took steps to make himself indispensable to Implant Direct. These actions included limiting the availability of potential successors through various machinations, threats to resign prematurely with no successor in place, requests for contract and employment agreement modifications, a number of which were honored, and ultimately, threats to evict the JVCs from the manufacturing facility utilized by Implant Direct in the building owned by the trust Dr. Niznick controlled (PX 173). The testimony adduced at trial established that while Dr. Niznick improved the profitability of the company from 2011 to 2013, almost from the inception of the joint venture, Dr. Niznick's management style was a concern to both Danaher and certain Implant Direct employees outside Dr. Niznick's circle of confidantes. Dr. Niznick's general behavior, documented in numerous trial exhibits and in the testimony of numerous trial witnesses, included sending emails to JVCs Board members and executives at all hours of the day and night criticizing the manner in which Implant Direct was being run under Danaher, and screeds in which Dr. Niznick sought to re-negotiate various aspects of his rights and obligations under the Operating Agreements, including conflicting demands concerning his future role with the JVCs (PX 179, PX 183, PX 170, PX 171).
In early 2011, Dr. Niznick resigned from two of the Implant Direct sister companies in response to an anonymous hotline investigation that Danaher had the duty to investigate under its internal policies. Danaher caved in to Dr. Niznick's early threats and demands. In 2011, Dr. Niznick extracted an apology from Danaher executives, a "Road Map" agreement concerning future relations between Dr. Niznick and Danaher, and Dr. Niznick's reinstatement as JVC President for all three Implant Direct entities (PX 32). Most significantly, Dr. Niznick secured an extension of his position as President from February 3, 2013 until December 31, 2013 (PX 79, DX 126, DX 128). The final employment agreement extension went through several drafts and was reviewed by multiple lawyers representing Dr. Niznick (PX 78; see also Tr. 1219:19 — 1221:13 [Niznick]), There were corresponding extensions of the ECO (PX 79, DX 126; Tr. 1222:26 — 1225:16 [Niznick]).
Emboldened by Danaher's prior concessions as the end of his December 31, 2013 employment term approached, Dr. Niznick offered to continue as President of the JVCs for another 3 years (PX 179, PX 170). Almost contemporaneously Dr. Niznick proposed instead to continue as a consultant (PX 179), and, at various times during late 2013 indicated that he was unwilling to remain with the company in any capacity (see PX 217). Further, as the JVCs' succession options narrowed in late 2013 with Dr. Niznick orchestrating the resignation of his son-in-law, Jon Konheim, a valued contributor to Implant Direct's manufacturing and sales operations (PX 144, PX 180), Danaher offered to extend Dr. Niznick's employment by another six months, but Dr. Niznick rejected the offer (PX 213). Among the many proposals Dr. Niznick made in 2013 with respect to his future role in the JVCs was to serve as Executive Vice President of marketing and product development starting January 1, 2014 (PX 170). Within 24 hours, Dr. Niznick revoked that offer by emailing Danaher on October 29, 2013 a "non-negotiable" demand to continue to work as President (PX 171).
Dr. Niznick continually reminded Danaher that his name was closely associated with the Implant Direct brand and that he was indispensable to Implant Direct (PX 44, PX 187). In addition, Dr. Niznick attempted to bolster and perpetuate his own position at Implant Direct by eliminating potential successors. In 2012 Dr. Niznick learned that the JVCs Board Chairman had direct communications with Marty Dymeck, an experienced senior Implant Direct manager, which occasioned a "falling out" between Dymeck and Dr. Niznick that led to Dymeck's dismissal (Tr. 217:2-12 [Duijnhoven]). Later in August 2013, when Danaher refused to cede to certain demands and threats, Dr. Niznick directed the departure of his son-in law, Jon Konheim. Dr. Niznick admitted in an email dated November 1, 2011 that he used Konheim as a "pawn," i.e. a bargaining chip to leverage his negotiations with Danaher (PX 77; Tr. 1376:15-19 [Niznick]), anticipating that Konheim's departure would leave core business operations like manufacturing and sales exposed in the absence of a suitable replacement. Indeed, as the email chain noted, Konheim was recruited to Implant Direct in the first place to enable Dr. Niznick to terminate Mr. Dymeck (PX 77). After Konheim's departure, Dr. Niznick personally assumed the not insubstantial responsibilities Konheim was discharging (PX 180).
The mass of emails written by Dr. Niznick, dozens of which were admitted into evidence at trial, contain the many threats, demands, and changing positions that comprised his conduct during the period 2011-2013 (see, e.g., PX 179, PX 204, PX 137). None, however, more telling of Dr. Niznick's general state of mind and modus operandi as an email Dr. Niznick wrote to an [*4]acquaintance on December 1, 2011 [FN5]
:
I own 25% of the Joint Venture which is run by a Board of Directors. Sybron had control but they do what I want when faced with me threatening to quit so I have my cake and got to eat it also Another email by Dr. Niznick dated August 21, 2013,[FN6]
during his campaign to retain his relationship with the company he founded, states:
I received a response from Henk [JVC Board Chairman] that Danaher would agree to distribute all of my share of the profits, but only for the 3-year period I offered to serve as President of IDSM. This made it apparent to me that Danaher thought it could use the holding of my share of the profits as leverage in negotiations. Henk's offer also contained other unacceptable terms including the provision that the BOD, controlled by Danaher, could appoint an overall president of the 3 entities, thereby usurping my authority over day-to-day operations at IDSM. I found these terms not only unacceptable but also insulting. I withdrew my offer to stay on as President of IDSM on August 2 and replaced it with an offer to continue to work as a consultant with responsibilities of the VP of Product Development, Marketing with Regulatory Affairs. I included a signed draft Amendment to the Operating Agreement making the distribution of my share of the profits mandatory. This proposal was for an income of $10,000 per month with either party being able to cancel this agreement with 90 days' notice. This offer also included an extension of the Calabasas factory lease set to expire October 2014. My offer stated that it was dependent on acceptance at the next BOD meeting 4 days later (Aug. 6). I further stated that if it were not accepted by that date, Jon Konheim (currently running our inside sales group and our manufacturing operations) would resign effective the end of August. Both Dan Even and Henk had offered him the position of COO, leading to CEO based on his performance and knowledge (he is a lawyer and MBA). At the August 6th BOD meeting, Henk said he did not think the Amendment would be acceptable and that the people at Danaher who would have to approve this were on vacation. The meeting closed with Jon Konheim resigning effective August 31, 2013 as I said he would, and my not committing to renew the lease on the Calabasas factory, which seemed to be Henk's primary concern. (Emphasis added.) According to the testimony of Daniel Raskas, head of corporate acquisitions at Danaher, and Henk van Duijnhoven, the JVCs Chairman from 2011 to 2016, both of whom the Court found entirely credible and whose testimony was fully corroborated by documentary evidence introduced into evidence at trial, Danaher and the JVCs Board made multiple concessions to Dr. Niznick between 2011 and 2013 because, on balance, these concessions were in the best interests of the JVCs even though the concessions involved acquiescing in conduct by Dr. Niznick of which Danaher did not approve. Raskas and Duijnhoven recognized Dr. Niznick's importance to Implant Direct (gross sales increased from $50 million in 2010 to $80 million in 2013) and further recognized Danaher's vulnerability concerning the Calabasas and Valencia facilities in California, both of which were controlled by Dr. Niznick and leased to the JVCs as part of the 2010 transaction. For example, Duijnhoven acquiesced to Dr. Niznick's demand to terminate [*5]Dymeck in 2012. Dr. Niznick kept "turning up the heat" and in August 2013 threatened, and eventually caused, the resignation of Konheim (PX 144, PX 180).[FN7]
Less than a week after Konheim departed, Dr. Niznick made his role in Konheim's resignation clear: "Ignoring my last deadline resulted in the resignation of Jon Konheim." (PX 180). Dr. Niznick also expressly refused to recruit or train a successor in contravention of his employment agreement (PX 137). Duijnhoven further acquiesced to Dr. Niznick's threats concerning the facility leases when Danaher agreed to increase excess cash distribution to Dr. Niznick from 50% to 90% in exchange for an extension of the Calabasas lease in connection with an amendment to the Operating Agreements dated October 4, 2013 (PX 197, PX 198A).
In late October 2013, in the midst of negotiations concerning Dr. Niznick's future role in the JVCs and other monetary concessions, the situation escalated when an anonymous complaint was lodged into Danaher's hotline which alleged Dr. Niznick was having an inappropriate sexual relationship with a female subordinate at Implant Direct by the name of Josie Jurcoane (PX 219; Tr. 271:14-23 [Duijnhoven]). Dr. Niznick was aware for months before the hotline complaint that rumors had spread at Implant Direct's headquarters about his relationship with Ms. Jurcoane (Tr. 611:1-16 [Niznick]). Two Implant Direct directors, Dawn Heilman and Virginia Page, testified at trial about Dr. Niznick's and Jurcoane's close relationship (see e.g. Tr. 470:22-26 [Heilman]). While the Court can draw no conclusion about the veracity of the allegations, and both Dr. Niznick and Ms. Jurcoane denied the allegations in their trial testimony, there is no question that Ms. Jurcoane was a close confidante of Dr. Niznick as she received blind copies of documents concerning Dr. Niznick's negotiations with Danaher as well as sensitive communications about Implant Direct's business and, ultimately, Dr. Niznick's litigation strategy, all of which were unrelated to any Implant Direct responsibilities Ms. Jurcoane had (see, e.g., PX 307, PX 340A, DX 364). 
During the course of this litigation it was revealed that Tom Stratton, an Implant Direct executive whom Dr. Niznick hired in 2012, lodged the complaint because Stratton was surreptitiously vying to become Dr. Niznick's successor as JVCs President and Stratton feared that Danaher would extend Dr. Niznick's employment contract as President for three years (Tr. 611:5-20 [Stratton]). Dr. Niznick was enraged by Danaher's decision to hire external counsel to investigate the October 2013 hotline complaint in accordance with Danaher's policies and Standards of Code (PX 46A) as well as the terms of the 2011 Road Map agreement. On October 31, 2013, Dr. Niznick emailed to the Board that "Per my employment contract, I hereby give you 30 days' notice. My last day with the company will be November 30, 2013." (DX 308A).
Recognizing that his resignation before the December 31, 2013 expiration of his employment agreement might trigger Danaher's Employment Call Option (ECO) under the amendments to the Operating Agreements and thus allow Danaher to buy out Dr. Niznick's 25% interest, Dr. Niznick attempted to withdraw the resignation six days later by means of a letter dated November 6, 2013 from his attorney to the Board (DX 317). However, by this time the Board had had enough of Dr. Niznick's petulant behavior, threats, demands, and changing positions and the Board took the position that the Board considered Dr. Niznick's resignation [*6]irrevocable and effective November 30, 2013. The Operating Agreements provide at §5.02 that an officer's notice of resignation is effective when received by the Board "without any need for acceptance." (PX 76, PX 21, PX 22). 
This Court decided in an interim decision dated January 31, 2017 that, as a matter of law, Dr. Niznick's resignation was effective upon tender and Dr. Niznick resigned as of November 30, 2013 (NYSCEF Doc. No. 846). Significantly, subsequent to the issuance of the Court's interim decision, evidence adduced at trial demonstrated that Dr. Niznick had communicated his understanding that his resignation was effective November 30, 2013 in emails to Ms. Jurcoane, and Messrs. Konheim and Chang, among others (see e.g., PX 223, PX 236, PX 240). The JVCs Board of Managers held a Board meeting on November 26, 2013 at which Tom Stratton was elected to succeed Dr. Niznick as President of the JVCs (PX 237). Dr. Niznick was present at the meeting and voted in favor of Mr. Stratton's election as President. At the November 26 Board meeting, all discussion of Dr. Niznick's future role with Implant Direct was tabled as the minutes reflect (PX 237).
During 2013 Dr. Niznick had developed a friendly and collaborative relationship with Stratton. Unbeknownst to Dr. Niznick, Stratton was "playing" both Dr. Niznick and Duijnhoven to advance Stratton's own personal ambition. Stratton's cross-examination at trial revealed both his lack of qualifications to replace Dr. Niznick as President of Implant Direct and his duplicitous and manipulative behavior where, on the one hand, Stratton pledged 100% loyalty to Duijnhoven and Danaher (DX 1, DX 224) and, on the other hand, wrote exceedingly flattering and supportive emails to Dr. Niznick (PX 229, PX 172, PX 217, DX 224, DX 329). Dr. Niznick was not aware of secret text message communications between Stratton and Duijnhoven when Dr. Niznick voted for Stratton to become President of the JVCs on November 26.[FN8]
Commencing almost immediately after his election as President, Stratton embarked upon a "bull rush" upon a "bully" (DX 366) and entirely changed the tenor and tone of his communications with Dr. Niznick (see, e.g., PX 243). Stratton also immediately made personnel decisions which Dr. Niznick believed to be unwise and inexplicable (PX 243). Within a week, Dr. Niznick found out about Stratton's duplicity and back channel communications with Duijnhoven (PX 331). Thereafter Dr. Niznick went on a rampage that complicated the Board's desire to maintain a relationship between Dr. Niznick and Implant Direct.
Stratton began his new role as President on December 2, 2013. That same day, Dr. Niznick took five Implant Direct directors out to lunch a mile or two away from Implant Direct's Valencia, California office and disparaged Stratton and his management abilities and told the directors to "polish off" their resumes because Implant Direct is a "sinking ship" (Tr. 463:10-466:11 [Heilman]). Dr. Niznick also encouraged Jurcoane to file suit against Danaher in connection with the hotline complaint (PX 22; see also DX 308A). Thereafter, Stratton took steps to intentionally slight Dr. Niznick at the Implant Direct 2013 holiday party (Tr. 505:13 — 506:25 [Page]).
Raskas, Duijnhoven and Steve Tomassi, another JVC Board member, all testified that Stratton had significant sales experience but insufficient manufacturing and managerial experience in running a company like Implant Direct which, at a minimum, requires some [*7]knowledge of implant dentistry. The Danaher members of the JVCs Board had hoped to make up for Stratton's deficiencies by negotiating a consulting agreement with Dr. Niznick as these Board members were under the impression that Stratton and Dr. Niznick had a complementary work relationship (see Tr. 223:9 — 225:3 [Duijnhoven]). The Board members were not aware of the extent to which Stratton had torched his relationship with Dr. Niznick within days of his elevation to President. Nor were the Board members fully aware of how questionable Stratton's decision making was during the early weeks of his tenure as President.
Stratton's provocative and clearly hostile behavior toward Dr. Niznick precipitated threats and complaints from Dr. Niznick (PX 243, PX 297) and the Board ultimately decided it would not entertain any Consulting Agreement with Dr. Niznick that did not involve "peace" with Dr. Niznick (Tr. 293:7-9 [Duijnhoven]; Tr. 993:17—994:15 [Tomassi]). On December 20, 2013 the parties executed a five-year Consulting Agreement effective December 1, 2013 (PX 277). Notably, the Consulting Agreement contained two releases: (i) a mutual and general release by both parties from any disputes arising out of the employment relationship to that date, and (ii) a release by Danaher of its right to exercise the ECO in exchange for Dr. Niznick's representation that he was not aware of any "claims" he had against Danaher (PX 277, Exhibit B).
Nevertheless, on January 2, 2014, Dr. Niznick sent an 18-page letter to the Board claiming that Danaher was "attempting to hijack Implant Direct" and alleging a violation of the Operating Agreements based on a supposed secret "integration merger" with the Kavo-Kerr Group or "KKG" (PX 290), the name Danaher adopted to promote all of the companies in its dental platform. On January 9, 2014, Dr. Niznick followed up with formal Dispute Notice, followed by a litigation hold notice (PX 297), reciting the same factual allegations regarding the "integration" and also alleging a litany of purported wrongdoing by Danaher such as the appointment of Stratton as President, the promotions of Carlos Moran, Tom Creighton, and Scott Henkel to Vice President roles without Board approval, and Danaher's purported attempt "to enrich" itself at the expense of Implant Direct. Curiously, the day before sending the litigation hold notice to Danaher, Dr. Niznick requested Implant Direct employee Wing to delete Dr. Niznick's back-up data (Wing Tr. 70:21-71:2, 82:3-9). Dr. Niznick's backup data was apparently deleted on January 8, 2014 (Wing Tr. 70:21—71:2, 82:3-9; see also PX 253). Equally as curious, Ms. Jurcoane's laptop computer was lost or stolen some time during the pre-trial phase of the case (Wing Tr. 88:25-89:9; Jurcoane Tr. 55:1-56:8). Dr. Niznick's notices signaled to Danaher that Dr. Niznick misrepresented that he was not aware of any "claims" against Danaher in the Consulting Agreement, a representation upon which Danaher relied to release its ECO buyout right. At the end of the Dispute Notice, Dr. Niznick characteristically stated that he was "prepared to be reinstated as President" (PX 297 at 5).
The JVCs responded in two letters dated January 29, 2014, one notifying Dr. Niznick that his conduct constituted "Cause," thereby permitting Danaher to exercise its Cause Call Options (CCO), and one notifying Dr. Niznick that Danaher intended to exercise its Employment Call Option (ECO), to buy out Dr. Niznick's entire minority interest of 25% pursuant to §9.04 of the Operating Agreements (DX 460). Another JVCs letter dated January 31, 2014 terminated Dr. Niznick's Consulting Agreement (PX 318). Dr. Niznick was also notified that he forfeited his seat on the JVCs Board (DX 460). 
Less than a month later, Dr. Niznick sent a notice of rescission of the lease extensions for the Calabasas and Valencia facilities, lease extensions that Dr. Niznick approved 4 months [*8]earlier (PX 323). The JVCs accepted the rescission (PX 349B) and Implant Direct's manufacturing facilities were subsequently relocated to Thousand Oaks, California at the expense of $3 million. Thereafter, in March 2014, Dr. Niznick filed two lawsuits against the plaintiffs in California (which have since been dismissed) and the plaintiffs filed this lawsuit in New York. The California lawsuits were filed in violation of a Forum Selection Clauses in Section 15.07 of the Operating Agreements.[FN9]

CONCLUSIONS OF LAW
The Operating Agreements contain three buyout provisions, one mandatory and two optional. The mandatory buyout provision in §9.04(a) of the Operating Agreements required Danaher to purchase 5% of the Dr. Niznick's interest in the JVCs on January 31, 2014. The two optional buyout provisions contained in §9.04(b) have different terms and conditions. Under the Employment Call Option or ECO in §9.04(b)(i) of the Operating Agreements, Danaher reserved the right to buy "all but not less than all" of Dr. Niznick's interests at a price set by a certain formula if Dr. Niznick resigned prior to the termination date of his employment without "Good Reason." To exercise the ECO option, Danaher must provide Dr. Niznick with a written notice within 30 days of Dr. Niznick's termination of employment. The second call option, the Cause Call Option or CCO in §9.04(b)(ii) of the Operating Agreements, gives Danaher the right to purchase "all but not less than all" of Dr. Niznick' s interests at a price set by a different formula if a Court of competent jurisdiction determines that Dr. Niznick committed "Cause." [FN10]
To exercise the CCO option, Danaher must provide Dr. Niznick with a written notice within 30 days after a Court determines that "Cause" existed. In addition, Cause is not tied to Dr. Niznick's employment status with the JVCs. The CCO is active so long as Dr. Niznick "directly or indirectly owns" shares in the JVCs, and for an additional five years after his shares are sold; its prohibitions were in full effect throughout 2013 and 2014, and remain in effect today (DX 21, DX 22, DX 76). Section 9.04 of the Operating Agreements which contains both the mandatory and optional buyout provisions provides in relevant part and with emphasis added:
Section 9.04 Mandatory Buyout; Call Options.
(a) Mandatory Buy-Out. On January 31, 2014, Danaher shall purchase, and ID [Implant Direct] shall sell to Danaher, (i) a number of Membership Units [shares] in the Company that equals five (5%) of all of the Membership Units outstanding as of such date [ ]
(b) Call Options.
(i) Employment Call Option
(1) Except as provided in Section 9.04(b)(iii), from and after the occurrence of the termination by [Dr.] Niznick of his employment with the Company without Good Reason prior to February 3, 2013 [later amended to December 31, 2013], Danaher shall have the right, but not the obligation, to purchase from ID, and ID shall have the obligation to sell [*9]to Danaher, all but not less than all of ID's Membership Units in the Company and the membership units of the other Joint Venture Companies, [ ] (the "Employment Call Option") [ ] The Employment Call Option shall expire and be of no further force or effect if Danaher for any reason (I) fails to give notice within thirty (30) days immediately following [Dr.] Niznick's resignation without Good Reason [ ]
(ii) Cause Call Option
(1) From and after the occurrence of the taking of any act or failure to take any act by [Dr.] Niznick [ ] which is determined by a court of competent jurisdiction to constitute Cause, Danaher shall have the right, but not the obligation, to purchase from ID, and ID shall have the obligation to sell to Danaher, all but not less than all of ID's Membership Units in the Company [ ] (the "Cause Call Option") [ ]
(4) Should Danaher elect to exercise the Cause Call Option, Danaher must deliver a written notice to ID of its exercise of the Cause Call Option within thirty (30) days after a determination by a court of competent jurisdiction that any act or omission by [Dr.] Niznick [ ].
In connection with the Cause Call Option, "Cause" is defined as a material breach by Dr. Niznick of Dr. Niznick's fiduciary duties under Article X of the Operating Agreements. Article X includes a non-competition provision which provides in relevant part:
Section 10.02 Non-Competition.
(a) Prohibited Activities. As a material part of the consideration to the Company and Danaher for entering into this Agreement, and as a material part of the consideration for the purchase and sale of the equity interests of the Company pursuant to the Transaction Agreement [ ] [Dr.] Niznick [ ] shall not, and shall cause its and his present and future Affiliates [ ] employ or hire away any Restricted Person [as defined in §1.01] or (II) call upon, solicit or communicate with any Restricted Person for the purpose or with the intent of enticing, or in a manner reasonably likely to entice, such Restricted Person to leave the employment of or sever his or its engagement with the Company [ ] (Emphasis Added).
With respect to Dr. Niznick's extension of employment as JVCs President, an amended employment agreement dated October 20, 2011 extended Dr. Niznick's employment as the President of the JVCs to December 31, 2012 with an automatic one-year renewal to December 31, 2013, in the absence of prior written notice to terminate by either party (PX 79). Neither party provided a termination of employment notice by December 31, 2012. Thus, Dr. Niznick's employment was extended to December 31, 2013. In addition, the employment agreement dated October 20, 2011 expressly stated that the date in Section 9.04(b)(i)(l) of the JVCs' Operating Agreement, i.e. the ECO provision, "shall remain December 31, 2012, and if this Agreement is extended for an additional year, then such date shall be extended to December 31, 2013." [FN11]

The Employment Call Option
As previously noted, Danaher's awareness of Dr. Niznick's experience with Zimmer gave rise to Danaher's insistence on the ECO and CCO options in its 2010 negotiations with Dr. Niznick. And, Dr. Niznick's post-2010 conduct gave rise to plaintiffs' declaratory judgment claims that Danaher is entitled to exercise the ECO to buy out Dr. Niznick's entire minority interest in the JVCs. Plaintiffs assert that the release of Danaher's ECO right in the Consulting Agreement is void because it was procured by fraud.
Dr. Niznick disputes that plaintiffs are entitled to exercise the ECO because: (i) the ECO right was released in the Consulting Agreement; (ii) Dr. Niznick withdrew his resignation on November 6, 2013 and therefore did not resign without "Good Reason" prior to the end of his employment; (iii) Dr. Niznick's employment as President was mutually terminated in contemplation of Dr. Niznick entering into a Consulting Agreement, which Danaher subsequently ratified by its continued payment of consulting fees to Dr. Niznick; and (iv) Danaher failed to provide timely notice of its intent to exercise the ECO.
The Court has already ruled in a six-page decision issued on January 31, 2017 that, as a matter of law, Dr. Niznick's resignation was effective upon tender because Dr. Niznick's resignation letter scrupulously followed the 30-day notice requirement of his employment agreement, and Section 5.02 of the Operating Agreements, which governs the resignation of officers, expressly provide that an officer's resignation notice is effective upon receipt "without any need for acceptance" by the Board. Construing the provisions of the Operating Agreements and employment agreement together, as required by §15.02 of the Operating Agreements, Dr. Niznick's 30 days' notice, coupled with his subsequent approval of Stratton as his successor on November 26 affirmed his intent to resign on October 31, 2013 and to terminate his employment as President on November 30, 2013. 
The circumstance that Danaher insisted on hiring an outside law firm to investigate the 2013 hotline complaint against Dr. Niznick certainly did not provide Dr. Niznick with a "Good Reason" to resign. Further, the letter sent by Dr. Niznick's attorney six days after Dr. Niznick's resignation notice did not effectively withdraw the resignation under the relevant circumstances and contractual provisions governing the relationship. In addition, Robert Kehr, Dr. Niznick's longtime transactional attorney who reviewed the employment agreement before it was executed (PX 78), confirmed the ramifications of Dr. Niznick's early resignation in an email dated November 25, 2013. "The only possible consequence of your terminating your employment before Dec. 31, 2013," he wrote, "is that Danaher could exercise the employment buy-out under the operating agreement" (PX 331). Therefore, since Dr. Niznick terminated his employment prior to December 31, 2013, Danaher's ECO buyout option was properly triggered.
Furthermore, the Court finds that Danaher's January 29, 2014 notice of intent to exercise the ECO was timely (DX 447 at 2). As previously stated, Dr. Niznick resigned effective November 30, 2013. Danaher did not provide Dr. Niznick with a notice of its intent to exercise the ECO within 30 days of Dr. Niznick's resignation (i.e., on or before December 30, 2013) [*10]because the parties were contemporaneously attempting to negotiate a Consulting Agreement. A Consulting Agreement was executed on December 20, 2013, ten days before the expiration of the 30-day notice period. The Consulting Agreement contained a release of Danaher's ECO claim. However, Danaher discovered that its agreement to release the ECO right in the Consulting Agreement was fraudulently induced because approximately three weeks after the Consulting Agreement was executed, Dr. Niznick presented Danaher with a long litany of claims, most of which were known to Dr. Niznick prior to December 20. Danaher sent two letters dated January 29, 2014 advising Dr. Niznick that Danaher reserved the "right to take all appropriate actions under the Operating Agreements, including exercising the Employment Call Option" (DX 447 at 2), and invoking the ECO (DX 460 at 2). Danaher's notice requirement under Section 9.04 of the Operating Agreements was thus tolled between December 20, 2013 and January 9, 2014 as case law clearly supports the finding of such a toll. See, e.g., Simcuski v Saeli, 44 NY2d 442, 448—49 (1978) ("[A] defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action."); accord Bank of NY v Ulster Heights Properties, Inc., 114 AD2d 431, 433 (2d Dept 1985) ("equity will intervene to prevent a forfeiture where a delay in giving notice . . . results from . . . fraud"). Consequently, Danaher's January 29, 2014 notice of its intent to exercise the ECO was timely as it was sent to Dr. Niznick within 30 days of the January 9, 2014 notice.
Dr. Niznick's argument that he had "Good Reason" to resign because the Board would not ignore an anonymous hotline complaint filed against him or that the nature of the complaint was never described to him is unpersuasive and contradicted by the evidence adduced at trial. Dr. Niznick's own resignation email dated October 31, 2013 demonstrates Dr. Niznick's vehement objection to the investigation, notwithstanding that Dr. Niznick agreed in the 2011 Roadmap Agreement to be bound by Danaher's Standards of Conduct (Tr. 1347:8-10 [Niznick]; PX 35), including Danaher's investigation of all reported violations of law, Danaher's Standards of Conduct, or other policies (PX 46A, PX 35). Further, an email dated November12, 2013 from Terry Sanchez who was tasked with investigating the complaint indicates that Sanchez personally described the nature of the complaint to Dr. Niznick (PX 228A). Finally, Dr. Niznick did not comply with the objection and cure provisions related to the ECO in §9.04 of the Operating Agreement.
With respect to the ECO release in the Consulting Agreement, the evidence adduced at trial established that Dr. Niznick's representation that he was unaware of any "claims" against Danaher was false and a ruse to secure a release from the ECO claim. The 18-page letter and dispute notice that Dr. Niznick sent to Board three weeks after the Consulting Agreement was executed reference a variety of issues known to Dr. Niznick prior to December 20, 2013. The Court rejects as untrue Dr. Niznick's testimony that he had a post-December 20 "Eureka" moment when he realized that he had claims against Danaher after December 20, 2013 that were unknown to him at the time the Consulting Agreement was executed. Significantly, Dr. Niznick's testimony was impeached by several prior inconsistent sworn statements he made in other proceedings and filings.[FN12]
The Court is therefore free to reject much of Dr. Niznick's self-[*11]serving testimony as not credible.
Fraud in the procurement acts to void releases. Lupak v Simons, 1995 WL 5633 at 13 (Sup. Ct. 1995), citing Dice v Akron C & YR Co., 342 US 359, 362 (1952); see also, Powell v Adler, 128 AD3d 1039, 1040 (2d Dept 2015) ("A signed release 'shifts the burden of going forward . . . to the [plaintiff] to show that there has been fraud, duress or some other fact which will be sufficient to void the release,' citing Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V., 17 NY3d 269, 276 (2011). Consequently, Dr. Niznick's fraud vitiates both the specific ECO waiver and the broader general waiver in the Consulting Agreement, given that plaintiffs would not have agreed to any waiver but for Dr. Niznick's (false) representations that he was unaware of any claims (PX 277; see Tr. 995:15-26 [Tomassi]).
The so-called Kavo-Kerr Group "integration" transactions raised in Dr. Niznick's 18-page email and dispute notice largely consisted of initiatives of which Dr. Niznick was fully aware and supportive of in early 2013. Indeed, Dr. Niznick's Implant Direct business card contained the Kavo-Kerr logo. In an email dated May 24, 2013, Dr. Niznick admits having set in motion a collaboration between Kavo and Implant Direct by providing customers of Kavo's I-Cat machine a $10,000 credit with Implant Direct (PX 142). In an email dated September 23, 2013 Dr. Niznick states that he had prepared slides for the 2014-2016 Strategic Plan presentation, and the attached slides contain a segment in which Dr. Niznick touts a Kavo-Kerr Group and Implant Direct partnership and the distribution of the Lythos and Arctica machines as part of that collaboration (PX 187, PX 188, PX 190). Dr. Niznick wrote that expanding the JVCs product portfolio into digital workflow solutions (including distribution of the Lythos and Arctica systems, was one of the JVCs' "3 Year Objectives" (PX 190). In sum, Danaher's release of its ECO right in exchange for Dr. Niznick's misrepresentation is null and void because New York law does not enforce fraudulently induced releases (Lobel v Maimonides Med. Ctr., 39 AD3d 275, 276 (1st Dept 2007). In addition, Section 8.3 in the Consulting Agreement contains a Severability Clause, permitting the Court to invalidate only the ECO release, contrary to the defendant's collateral argument that Danaher may not seek partial recession of the Consulting Agreement.
As for the defendants' argument that Danaher ratified the Consulting Agreement by continuing to pay Dr. Niznick his consulting fees is unavailing under the circumstances. Both Duijnhoven and Tomassi testified that the Board's decision to continue to pay Dr. Niznick's the consulting fees was intended to avoid further litigation that Dr. Niznick threatened to file in Nevada should they suspend payments (PX 329). And the evidence at trial established that Dr. Niznick provided no consulting services to Implant Direct. After terminating that Agreement, the JVCs did not request any services or advice under it. Dr. Niznick admitted as much in his pleadings, affirming that "neither Stratton nor any designated associate [of the JVCs] has made any such requests [for consulting services] to Dr. Niznick after January 1, 2014." (NYSCEF Doc. No. 182, ¶ 148).
Moreover, the Court accepts as true the testimony of Duijnhoven and Tomassi that there [*12]were no circumstances under with Danaher would have agreed to the December 20, 2013 Consulting Agreement without an express warranty from Dr. Niznick that there would be "peace" between Dr. Niznick and Direct Implant and Danaher. Dr. Niznick's January 29, 2014 email to Jurcoane (PX 307) about the ECO buttresses the Court's finding of falsity and misrepresentation. The email provides:
O n the employee call option, they need to invalidate the employment agreement based on what I was aware of on December 20 and the argument could be that until I consulted attorneys in January after the sales meeting, hearing Tom to refer to Henk as his Boss, and learning that Henk was there as VP of KKG, they have a tough case to make.
Also contrary to defendants' contention, the Consulting Agreement was not a substitute for Dr. Niznick's employment agreement because his resignation was effective on November 30, 2013 and it was understood by both parties on November 30 that the negotiation of a Consulting Agreement might or might not be successful (Tr. 992:6-19 [Tomassi]; Tr. 1414:6 — 1416:24 [Niznick]). At best, the two parties had an agreement to attempt to negotiate a Consulting Agreement and that agreement was untethered to Dr. Niznick's resignation as President. It is also clear from the evidence and trial testimony that Danaher was prepared to move forward without Dr. Niznick by the end of November 2013,[FN13]
and the Consulting Agreement was entered into on condition that it would bring "peace" to the contentious relationship. Additionally, Section 7.4 of the Consulting Agreement entitled "Termination and Effect of Prior Employment" provides that Dr. Niznick's status as an "employee and officer terminated effective as of November 30, 2013." (PX 277 at 4).
In addition to finding that Danaher's ECO right is exercisable as of January 29, 2014, the Court finds that Danaher's right to exercise the ECO and purchase all of Dr. Niznick's 25% interest trumps the mandatary buyout provision of §9.04(a) which required Danaher to purchase 5% of Dr. Niznick's interest on January 31, 2014. It is clear from the foregoing discussion that Dr. Niznick forfeited his right to a mandatory buyout of 5% of his interest in the JVCs by entering into the Consulting Agreement in bad faith in an attempt to have the ECO option vitiated. Moreover, because the ECO option was exercisable as of January 29, 2014, any excess cash or retained earnings paid to Dr. Niznick by the JVCs thereafter should be offset against whatever sums Danaher pays Dr. Niznick to exercise its ECO in accordance with the formula in the Operating Agreements. The ECO exercise price will be calculated as of January 29, 2014, and Dr. Niznick is entitled to pre-judgment interest for the sums he should have received on January 29, 2014.
Finally, the Operating Agreements provide in §4.02(f) that Dr. Niznick would forfeit his seat on the JVCs Board of Managers and the right to vote if Dr. Niznick resigned without "Good Reason" prior to the end of the employment term, which had been extended to December 31, 2013. Therefore, as the Court has found that Dr. Niznick resigned without "Good Reason" on November 30, 2013, Dr. Niznick was properly deprived of his seat on the JVCs' Board of Managers.
The Cause Call Options
The JVCs notice dated January 29, 2014 listing Dr. Niznick's acts that constitute "Cause" include, inter alia, disparagement of Stratton and Danaher, "enticement" of the five directors at the December 2, 2013 lunch to leave Implant Direct, encouragement of several other JVC employees to resign, encouraging Josie Jurcoane to sue the JVCs, and making repeated off-color sexual remarks and insults to JVCs employees which, objectively, would cause employees to consider resigning or actually resign. 
The words "entice" or "enticement" are not defined in the Operating Agreements. The plain meaning of these words in the context of a non-compete covenant is to "employ or hire away" an Implant Direct employee, or cause an Implant Direct employee to "sever" his or her "engagement" with the company. Dr. Niznick's disparagement of employees and colleagues constitute "Cause" as Dr. Niznick acted in a manner that was unreasonable, overbearing, and petulant over an extended time period in which Dr. Niznick became accustomed to "have his cake eat it too."
Dr. Niznick indicated to several Implant Direct directors at the December 2, 2013 lunch that the future of the company was precarious and that they should consider other options. But Dr. Niznick neither offered any of these employees another job nor solicited any of them to compete with Implant Direct in the dental implant industry. None of the five directors who attended the December 2, 2013 lunch with Dr. Niznick left Implant Direct's employ subsequent to the lunch. Some of these employees ultimately resigned for unrelated reasons, and others are still working at Implant Direct. However, the trial testimony established that Jon Konheim severed his relationship with Implant Direct in August 2013 because of Dr. Niznick. Konheim's testimony established that he was interested in remaining at Implant Direct but that his relationship with Dr. Niznick was such that he had no choice but to be used as a "pawn" in Dr. Niznick's machinations. Konheim's testimony that he voluntarily resigned (Tr. 1135:19 — 1136:11 [Konheim]) is not credible in the face of Board meeting minutes and an email introduced into evidence that established Konheim's interest in remaining at Implant Direct and participating in a Danaher executive training program (PX 145).
Further, Dr. Niznick's employment agreement required Dr. Niznick to "identify, recruit, and train one or more successors," and Dr. Niznick expressly told Konheim in an email that "we do not want to build a succession team" (PX 137). Also, as the expiration of his own employment term drew near, Dr. Niznick stepped up the pressure on the Board in an attempt to force an extension: "I am not willing to train or assist my successor since Danaher has a pathway to keep me as president." (PX 179). He disclaimed his duty to train a successor, stating that he would "not communicate with anyone designated to be my replacement as that is not part of my job description." (PX 202). Dr. Niznick even went so far as to tell the JVCs' CFO to include in the President's Letter that "the president of the joint venture company Dr. Niznick has tendered his resignation effective the end of this month with no transition team in place." (PX 223).
Moreover, Dr. Niznick unquestionably made inappropriate, off-color, crude, sexual remarks to various employees. For example, Robin Reck testified that she considered leaving Implant Direct when she was designing an advertisement and wrote "coming soon" as placeholder for a product that was currently unavailable, and Dr. Niznick told Reck "to never use the words 'coming soon'" and then "leaned in" and said "[w]ell, how do you like it when a man says that to you?" (Tr. 460:8-16 [Reck]). Dr. Niznick also insulted Scott Henkel, a former JVCs employee who is Mormon, by bragging about his sexual prowess to Stratton and Henkel when [*13]the three men were discussing, at Dr. Niznick's initiation, whether Dr. Niznick had a sexual relationship with Ms. Jurcoane. Stratton and Henkel testified that Dr. Niznick stated "Don't doubt it for a minute because I can still F*** like a 40-year old" (Henkel Tr. 51:9 — 52:12; Tr. 604:14-20 [Stratton]). In addition, Dr. Niznick ridiculed Henkel about his religious beliefs as a Mormon at a business dinner by asking him whether he believes "all that shit?" and asking Henkel if was wearing his "magic underwear?" in reference to a religious undergarment worn by Mormons and the Broadway show, Book of Mormon (Henkel Tr. 53:22 — 57:9). Dr. Niznick also related his personal experience in a ménage à trois with prostitutes to Henkel (Henkel Tr. 59:11-25). Henkel testified that he considered such remarks offensive and that he considered leaving Implant Direct thereafter (Henkel Tr. 58:24 — 59:4). Virginia Page, an Implant Direct director, testified that when she inquired whether Dr. Niznick would be visiting with Ms. Jurcoane (who was then on medical leave) when he was taking a business trip in the vicinity of the city in which Ms. Jurcoane lived, Dr. Niznick replied that he "didn't need to travel across the country to get laid." (Tr. 498:14-19 [Page]). And, when Ahmad Rashidi, Information Technology director at Implant Direct, provided Dr. Niznick with a financial aid application and asked Dr. Niznick to subsidize his continuing education, Dr. Niznick turned the paper application into an airplane and flung it across the room (Rashidi Tr. 34:15 — 35:2). There was also testimony and documentary evidence that Dr. Niznick threatened to utilize the Calabasas manufacturing facility to co-found and operate an orthopedic screws manufacturing business. 
By any objective measure, such conduct by Dr. Niznick as the President of the JVCs materially breached Dr. Niznick's fiduciary duties and constituted "Cause" for the purposes of Danaher's exercise of the Cause Call Option. The Court thus finds that plaintiffs are entitled to exercise the CCO in accordance with the formula contained in the Operating Agreements. The forfeitures resulting from the exercise of the ECO would also apply with respect to the exercise of the CCO.
Furthermore, the defendants' argument that the CCO is an unreasonable liquidated damage provision is unavailing. The CCO, like the ECO, is a heavily negotiated contractual provision permitting Danaher to purchase Dr. Niznick's 25% minority interest in accordance with a negotiated formula that was integral to the entire structure and pricing of the original transaction. Therefore, the CCO is not a liquidated damages provision, but rather an optional buyout option. However, even if the CCO is a liquidated damages provision, the damages would not be unreasonable in light of the totality of circumstances of this case. Dr. Niznick's conduct caused major damage to Implant Direct, not the least of which was essentially leaving the company rudderless and with no credible management succession. Indeed, most of the senior officers promoted by Stratton are no longer with Implant Direct.
The Court also finds that Dr. Niznick breached the non-disparagement provision contained in Section 10.14 of the 2010 Transaction Agreement as well as the non-disparagement provision contained in Paragraph 8.6 of the 2013 Consulting Agreement. Both contractual provisions in essence prohibited Dr. Niznick from disparaging the business reputation of Implant Direct and any of its employees and affiliates. Dr. Niznick characterized Stratton as psychologically unstable, untrustworthy, and a "megalomaniac" who "was not qualified to be promoted to President." Dr. Niznick also suggested that Scott Henkel was "incompetent," "a waste of time," "worthless," and proclaimed that he had "accomplished absolutely nothing for [the] company" (PX 348). Dr. Niznick asserted that Tom Creighton was unethical and an incompetent manager (PX 290), and Dr. Niznick referred to Danaher as "idiots" who would ruin [*14]the JVCs. Current and former JVCs employees also confirmed that Dr. Niznick made "very disparaging remarks about Tom" that "cast a great deal of concern" that "the company was not going to succeed moving forward out of Tom's leadership." Tr. 465:2-22 (Heilman); Rashidi Tr. 75:06—76:08.
In addition, a third amendment of the Operating Agreements was annexed to the Consulting Agreement as "Exhibit A" (PX 277). Paragraph 7.2 of the Consulting Agreement provided that the termination of the Consulting Agreement for "Cause," which is defined as a material breach of the Consulting Agreement, would render the third amendment to the Operating Agreements null and void. Paragraph 7.2 of the Consulting Agreement provides in relevant part: 
7.2 Termination. Company may terminate this Agreement with or Without cause at any time with the termination effective thirty (30) days after Company's delivery to Consultant [Dr. Niznick] of written notice of termination [ ] If Company terminates for cause, Company must provide Consultant written notice of its intent to terminate this Agreement for cause and provide Consultant with 30 days to cure. Cause shall be defined as Consultant's material breach of this Agreement ("Cause") [ ] If Company provides notice of termination of this Agreement for Cause prior to December 31, 2018, and Consultant fails to cure within thirty (30) days, the provisions of paragraph 1 of the Third Amendment to the Operating Agreements shall immediately become null and void on the thirty-first day following Company's provision of such notice of termination. (Emphasis added).
The Court finds that the third amendment to the Operating Agreement is null and void because Dr. Niznick materially breached the Consulting Agreement by disparaging the reputation of Implant Direct, several Implant Direct directors and employees, and JVCs and Danaher executives. Dr. Niznick also materially breached the Consulting Agreement by fraudulently inducing Danaher to release its ECO right. However, Danaher is fully compensated for any damages arising from the aforementioned conduct by the Court's findings with respect to the ECO and CCO.
Excess Cash
The defendants' sixth counterclaim sounds in breach of the duty of good faith and fair dealing regarding excess cash distribution. Because the ECO was exercisable effective January 29, 2014, Dr. Niznick is not entitled to any excess cash thereafter. In all events, the JVCs Board has full discretion to distribute excess cash under the Operating Agreements. Section 7.01 of the Operating Agreements provides:
Section 7.01 Distributions.
(a) The Company shall distribute an amount equal to fifty percent (50%) of its annual Excess Cash (or such greater amount as determined by the Board of Managers) to the Members on an annual basis (or more frequently as determined by the Board of Managers), pro rata based on the number of Membership Units held by each Member's Percentage Interest.
And Section 1.01 of the Operating Agreements defines "Excess Cash" as:
[ ] all cash received by the Company from all sources (other than proceeds from loans or other financings or refinancings, liquidation events, and Capital Contributions) [*15]determined by the Board of Managers to be in excess of anticipated working capital expenses, capital expenditures and reasonable reserves for all expenses, expenditures and any contingent liabilities. (Emphasis added).
Tomassi, a JVC Board member whom the Court found to be a credible witness, testified that Dr. Niznick did not asked for cash distributions in 2011 and 2012. When Dr. Niznick asked for excess cash distributions in 2013, the Board made excess cash distribution to Dr. Niznick (Tr. 981:17-25 [Tomassi]). Tomassi further testified that at the end of 2013, the Board considered the substantial liability facing the JVCs by the legal disputes with Dr. Niznick. The JVCs also faced over $20 million in liability in connection with the Zest litigation, a patent infringement lawsuit between Implant Direct and a competitor, in which the JVCs were named successors in interest. Tomassi further testified that in 2014, Dr. Niznick threatened to assert additional counterclaims against the JVCs in this action in excess of $80 million in damages. In addition, both Tomassi and Duijnhoven testified that the JVCs Board acted in the best interest of the JVCs in deciding not to distribute excess cash to Dr. Niznick in 2014 and 2015 and to preserve working capital to cover the cost of litigation and potential liability with multiple lawsuits in multiple states (Tr. 454:20 — 455:3 [Duijnhoven]).[FN14]
However, any distributions of excess cash to Dr. Niznick in early 2017 for fiscal year 2016 were payments to which Dr. Niznick was not entitled by reason of the exercise of the ECO effective January 29, 2014 and/or the CCO.
Veto Rights
Five of the defendants' counterclaims rely on the allegation that Danaher improperly and secretly attempted to integrate Implant Direct with another company in Danaher's dental platform, Kavo-Kerr Group or "KKG," in contravention of Dr. Niznick's veto right in §4.02(f) of the Operating Agreements. The thrust of Dr. Niznick' s "integration claim" is that Danaher is using Implant Direct to the detriment of the JVCs and to the benefit of Danaher and KKG. The defendants identify four projects or "transactions" that Dr. Niznick either did not approve of or was not apprised of in contravention of his veto rights in §4.02(f) of the Operating Agreements: (1) The Marketing Intelligence Matrix ("MIM") Project; (2) The transfer of 400 titanium abutment blanks to KKG; (3) the JVCs efforts to market two Implant Direct products, InterActive and CustomDirect, as KKG products at the Chicago Dental Society February 2014 meeting; and (4) the JVCs' agreement in December 2013 to sell KKG products — Arctica milling machine and Lythos scanner — without Dr. Niznick's approval.
Section 4.02(f) of the Operating Agreements, which outlines the scope of Dr. Niznick's veto rights, provide in relevant part:
[ ] for so long as ID, any ID Affiliate, Niznick or Niznick's spouse or lineal descendants, or any other Permitted Transferee of ID holds a Percentage Interest in the Company equal to at least five percent (5%), ID or the designee of the Member who holds the Membership Units shall have the right to veto any transaction between the Company, on the one hand, and Danaher or any Danaher Affiliate (other than the Joint Venture Companies), on the other hand, provided that ID or the designee of the Member [*16]who holds the Membership Units shall not be unreasonable in exercising such veto right [ ] (Emphasis added).
The Operating Agreements do no define "transactions." The plaintiffs construe the provision narrowly. They argue Dr. Niznick's veto right is exercisable to stop "self-dealing" type of transactions between Danaher and Implant Direct. The defendants' construction of the veto right is broader. The defendants argue that Dr. Niznick has the right to exercise veto powers with respect to any transaction, including the four "transactions" identified by Dr. Niznick as part of his integration theory. The evidence adduced at trial established that the only "transaction" that actually occurred was the transfer of 400 titanium abutment blanks to KKG, an initiative that was unsuccessful and involved a sum of money so trivial as to be inconsequential and non-compensable. And the MIM project was, according to the trial testimony, a stillborn project, although it may well have constituted a transaction. 
Additionally, even assuming that Dr. Niznick had the broad veto rights that he claims with respect to these four "transactions," the documentary evidence adduced at trial belies the defendants' argument (see e.g. PX 99, PX 188, PX 142, PX 290). In a 2012 interview with Inside Dentistry, Dr. Niznick emphasized that "Danaher owns such well-known brands as Kavo, Kerr, ImageSciences, Sybron, and Pelton & Crane," and that Implant Direct plans to integrate efforts with Danaher and Sybron Dental Specialties sister companies to "bring full digital solutions for implant dentistry" (PX 99). Also, as previously stated, in one 2013 email, Dr. Niznick admits having set in motion a collaboration between Kavo and Implant Direct by providing customers of Kavo's I-Cat machine a $10,000 credit with Implant Direct (PX 142), and in another email with the 2014-2016 Strategic Plan slides attached (PX 188, PX 290), Dr. Niznick touts that there was a partnership between KKG and Implant Direct and that the Lythos and Arctica machines had been distributed as part of that collaboration. In short, the integration claim is without merit as it is clear that synergies had been contemplated by both Danaher and Dr. Niznick since at least 2012. Moreover, Danaher, as a multi-billion-dollar conglomerate which has been successful in part because of synergistic acquisitions like its investment in Implant Direct, would not have paid a premium to acquire a 75% interest in Implant Direct if it was precluded from having Implant Direct collaborate with other subsidiaries or affiliates in the Danaher dental platform. Finally, and most importantly, as noted, virtually none of the "integration transactions" actually occurred. Tr. 940:3—942:23 (Coates). Tr. 840:17-20 (Chang). Tr. 907:15-22, 921:19—922:4 (Smirl).
The above constitute the Court's findings of fact and conclusions of law.
Plaintiff is directed to settle an Order and Judgment on notice.
Dated: March 3, 2017
_______________________________________
J.S.C.



Footnotes

Footnote 1:Danaher Corporation is the parent of Sybron Dental Specialties. References to Danaher and Sybron are interchangeable in this decision by virtue of the parent-subsidiary relationship between the two entities.

Footnote 2:The three Operating Agreements are in Defendants' trial exhibits or "DX" 76, 21, and 22.

Footnote 3:Plaintiffs' trial exhibit or "PX" 72.

Footnote 4:The three Joint Venture Companies are: Implant Direct Sybron International LLC ("IDSI"), Implant Direct Sybron Administration LLC ("IDSA"), and Implant Direct Sybron Manufacturing LLC ("IDSM").

Footnote 5:PX 81

Footnote 6:PX 179

Footnote 7:Duijnhoven testified: "I increasingly felt I had a gun to my head" because Dr. Niznick was "intermingl[ing]" Konheim's employment with other issues that the Board was trying to negotiate with Dr. Niznick (Tr. 233:11 - 234:5).

Footnote 8:Dr. Niznick often reviewed emails exchanged by Implant Direct employees on the Implant Direct email system to which Dr. Niznick was not a party. (PX 253).

Footnote 9:Plaintiff's eighth cause of action seeks a declaration that the California lawsuits were filed in violation of the Forum Selection Clause in Operating Agreements and the Court so finds.

Footnote 10:Section 1.01 of the Operating Agreement defines "Cause" as "acts or omissions of [Dr.] Niznick [ ] that constitute a material breach of Article X of this Agreement (whether or not such provisions are enforceable), which are not cured within thirty (30) days following [Dr.] Niznick's receipt of written notice from the Company thereof." 

Footnote 11:Dr. Niznick claims that the October 2011 agreement did not change the ECO and the Board Seat Termination expiration date in the Operating Agreements because the wrong person signed it for Sybron. That argument is unavailing because Dr. Niznick approved the agreement, signed it, agreed to be bound by it, and accepted benefits under it. A contract need not be signed by both parties to be enforceable, and the strongest indicia that a party has assented to a contract is when that party accepts the benefits of the agreement without reservation (see, e.g., Dodge St., LLC v Livecchi, 32 F. App'x 607, 611 (2d Cir. 2002); Asesores y Consejeros Aconsec CIA, S.A. v Glob. Emerging Mkts. N.A., Inc., 841 F. Supp. 2d 762, 767 (S.D.NY 2012). 

Footnote 12:Compare Niznick Tr. 611:1-16 with Niznick Tr. 886:15—889:16. In addition, Dr. Niznick also swore in an affidavit that Danaher drafted the third employment agreement and he signed it without change and without having an attorney review it prior to signing (PX 341). However, both Dr. Niznick and Konheim (who is an attorney), reviewed and revised the employment agreement before Dr. Niznick signed it (Tr. 1184:14-22 [Konheim]; Tr. 1337:4, 1457:3-13 [Niznick]).

Footnote 13:As Duijnhoven and Tomassi testified at trial, Danaher "did not reach any agreement" regarding Dr. Niznick's potential Consulting Agreement by the November 26, 2013 Board meeting (PX 341; Tr. 289:8-25 [Duijnhoven); Tr. 992:4-23, 1033:17-19, 1036:9-10 [Tomassi]).

Footnote 14:Admittedly, Dr. Niznick considers litigation the "Sport of Kings": "a very, very expensive game" (Tr. 1331:3-9 [Niznick]).